**REINERT, Plaintiff, v. SHELBY MUTUAL CASUALTY CO., Defendant.**

Municipal Court, Civil Division, Dayton.

No. C-10195.   Decided June 26, 1951.

Jacobson & Durst, Dayton, for plaintiff.
Harshman & Young, Dayton, for defendant.

## OPINION

By McBRIDE, J:

The plaintiff purchased a new Chevrolet for $1788.00, plus tax, and on August 23, 1949 obtained comprehensive $50.00 deductible insurance policy from the defendant, The Shelby Mutual Casualty Company.

About October 1st, 1949, the car was damaged in an accident and the company paid $500.45 to plaintiff in settlement of the claim.

About November 12, 1949, a second and more serious accident was reported. At this time, plaintiff insisted he was entitled to a new car and refused to accept the company's offer to pay $1025.00 based on an estimate of an established Chevrolet dealer for the repair of the car. Plaintiff obtained a salvage estimate of $500.00 on the car in its damaged condition and on the basis of that estimate, a settlement was reached based on a valuation of $1725.00 prior to the accident, less $500.00 for salvage, less the $50.00 deductible feature and involving payment by the company to plaintiff of $1175.00. No agreement other than the formal subrogation statement was signed on this

settlement. The plaintiff retained his insurance policy and title to the vehicle.

Thereafter, the plaintiff accepted the lowest bid and had the car repaired for $683.72 through the use of used parts, some of which were welded. Although it is apparent that the plaintiff accepted old rather than new parts, the record is not clear as to the condition and value of the car after the repairs were made. The car was in the garage about one month. During this period, plaintiff contacted the local agents of the defendant insurance company from whom he had purchased the policy and obtained a suspension of coverage while the car was off the road. A credit memo was issued and when the plaintiff was ready to drive the car again, he requested and obtained a re-instatement of the policy as of December 20, 1949, from the defendant's local agent.

On August 9th, 1950, it happened again. This time the damages to the car amounted to $292.90. A claim was made, refused and the policy formally cancelled with a cash refund for the few days unexpired on the policy.

The pleadings set forth plaintiff's claim for $242.90, his damage less the deductible portion, and the defense of payment of the full actual cash value of the car in the prior accident. The defendant company's counter-claim seeks recovery of the difference between what it paid on the second accident and the cost of repairs, or $541.28 as money wrongfully withheld and offers to allow a credit on this figure of $242.90 for the third accident, and prays for judgment against the plaintiff for the difference of $298.38. The reply admits the repair of the car for $683.72, contains other admissions and denials and requests that the counter-claim be dismissed.

It is apparent that the settlement on the second accident was arrived at on the basis of a total actual loss of $1725.00 and that the salvage value represented therein and ownership of the vehicle was retained by the plaintiff. The fact that this basis was insisted upon by the plaintiff and accepted by the defendant company in determining the figure to be used in settling the loss did not prevent the plaintiff from using the vehicle. The fact that it was repaired with used parts for substantially less than the cash received does not establish that plaintiff received any excess beyond his actual loss nor that his real damages were any less. The economy exercised in making repairs indicates that the repaired vehicle was worth less than before such accident. From this record, we may conclude that after being repaired, this car—already the victim of two accidents—was actually worth about $1233.72, although on the market, a purchaser who failed to inspect it

or was unaware of its history would probably have paid more.

It is also significant that the highest estimate, which the company offered to pay the insured was only $150.00 less than the amount actually paid on the basis of total loss.

Under the circumstances, there being no fraud alleged or established, and in the absence of any testimony that the plaintiff was not actually damaged to the extent of such payment, the Court cannot support the company's claim that any money was wrongfully paid or withheld as a result of a settlement which the parties themselves accepted as the real loss after the customary negotiation.

This reduces the issue to the question of the company's liability under the policy for the $242.90, its share of the damage as a result of the third accident. It is argued that having settled on the basis of the full actual cash value on the second accident, the provisions of the policy for payment for damages to the vehicle were fully executed and exhausted and that the insured cannot make any further claim on the same particular car for any subsequent accident.

We have been referred to **Hayes Freight Lines v. Tarver, 148 Oh St 82, 35 O. O. 60** (1947) which holds that one who recovers the full value of a motor vehicle, or the full value less the salvage, may not also recover for loss of use of the vehicle. It is sound general law that an owner is to be made whole and it is common sense that if he has received the full value in one form or the other, he cannot receive more as the result of any **single** accident. The Hayes case applies to but one injury and has no application to a case which involves several distinctly separate accidents.

The case of Baker v. Central Insurance Company, 3 Oh Dec Reprint 478, (1868), presents a more ingenious argument. In that case, the defendant accepted a portion of the risk on the "steamer Sioux City" with permission to navigate the Ohio and Mississippi Rivers. When the risk was taken, the ship was navigating these waters. Subsequently her machinery, boilers and wheels were removed and placed upon another hull to which they were permanently adjusted. The hull of the Sioux City was lost lying at St. Louis where it was crushed and afterwards sunk by the ice. The lower Court decided that the description of the vessel as a "steamer" was a warranty of condition and use and that when the machinery and wheels were transferred, the original hull was virtually abandoned and the contract of insurance terminated. The Superior Court of Cincinnati held there was a warranty implied that the subject was a vessel, of such description and that it would continue to be so during the insurance contract

and that the abandonment of the hull for all purposes of navigation ended the risk of the underwriter. In other words, the subject matter of the contract ceased to exist as a "steamer."

It is argued that in the instant case that since at the time of the settlement, the plaintiff refused the offer to repair and insisted that the settlement be on a total loss basis, with a deduction for salvage value, that the particular motor vehicle ceased to exist and therefore that liability under the contract came to an end as in the steamer case. The difficulty with the argument is that in the steamer case, the change in the condition and abandonment of the vessel was a fact; in the instant case such a change or abandonment is a fiction which arises out of the method knowingly used in reaching the settlement and not out of the facts in the case. The damaged vehicle continued to exist and to be knowingly used as such within the purpose and expression in the policy and also the motor vehicle act. The record discloses that the plaintiff's car did not lose "its character as a motor vehicle, or changed in such manner that it is not the motor vehicle described in the certificate of title * * *." **Sec. 6290-12 GC.**

The change that resulted to the car is reflected in an endorsement of November 14, 1949, attached to the policy which indicates a cancellation of all coverage except comprehensive (fire, theft, etc.) while the vehicle was in the garage undergoing repairs and the issuance on December 20, 1949, by the defendant of a "re-instatement of insurance" form.

The policy in question is described as national standard automobile policy, first revision. The issue arises under schedule E-1 Collision or Upset, which lists the limit of liability as "actual cash value less $50.00 deductible." Coverage E-1 is defined in the agreement as follows:

"To pay for direct and accidental loss of or damage to the automobile, hereinafter called loss, caused by collision of the automobile with another object or by upset of the automobile, but only for the amount of **each such loss** in excess of the deductible amount, if any, stated in the declarations as auplicable hereto."

This provision clearly obligates the insurance company to pay for EACH loss in excess of the deductible amount and not in excess of the actual cash value. There is no limitation on the liability of the company for successive accidents so long as each individual loss is within the limitations expressed. It is apparent that the company adopted this interpretation because the losses paid on the first two accidents, plus the salvage value exceed the actual cash value

as well as the original purchase price of the vehicle. It is conceded in the company's brief that it could not cumulate the payments it might make for separate accidents and then claim that the limit of liability was reached when it paid a total equal to the actual cash value of the automobile.

The company pleaded that its liability for the third accident was limited as a result of paragraph 13 of the contract, however, in its brief it is admitted that the policy does not permit such interpretation.

Paragraph 13 reads:

13. Limit of Liability; Settlement Options; No Abandonment—Coverages D, E-1, F, G-1, H and I:

The limit of the company's liability for loss shall not exceed the actual cash value of the automobile, or if the loss is of a part thereof the actual cash value of such part, at time of loss nor what it would then cost to repair or replace the automobile or such part thereof with other of like kind and quality, with deduction for depreciation, nor the applicable limit of liability stated in the declarations.

The company may pay for the loss in money or may repair or replace the automobile or such part thereof, as aforesaid, or may return any stolen property with payment for any resultant damage thereto at any time before the loss is paid or the property is so replaced, or may take all or such part of the automobile at the agreed or appraised value but there shall be no abandonment to the company.

Construed with the rest of the contract, this provision limits the liability for each loss and as indicated in its caption provides for settlement options such as, actual loss, replacement cost, or the company make take the automobile at its agreed or appraised value.

In this case, the company did not elect to take title nor to repair the car, nor does the testimony indicate that the amount of the loss was determined by the repair or replacement provision. The parties finally agreed to settle the second claim on the cash value of the loss as determined in their bargaining.

In doing so the company exercised one of its options in paragraph 13 in settling one loss.

The company pleads that this payment "constituted the limit of its liability to the plaintiff as set forth in condition 13 and that there was no collision coverage existing at the time of the accident * * * on July 9th, 1950." We have not been referred to any case which so interprets such a standard automobile policy and in view of the general rules of construction applied to such policies we must hold that the

**240**

written instrument recognizes the actual cash value as the limit of liability of each loss and that such recognition indicates an understanding that payment of such limit in no way restricts the liability of the insurance company for subsequent losses to the same vehicle where the company permits the insured to retain an insurable interest in the subject of the contract. This conclusion is particularly justified where subsequently the company recognizes the existence of the policy by suspending its operation while the car is repaired and re-instating the policy after such repairs are completed. Such conduct operates as an estoppel to prevent the company from asserting that the policy was no longer effective for the purpose for which it was issued.

An entry may be prepared finding for the plaintiff for $242.90 and against the defendant on its cross-petition.